```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,
                                                    DEFENDANT'S
        -against –                                  FIRST SENTENCING
                                                    MEMORANDUM
RICHARD HASTINGS,
                Defendant.                          14-cr-139 (GLS)
```

## INTRODUCTION

Richard Hastings has had a challenging, frequently sad, life that has led him to conduct, that he truly regrets, for which he now hopes to receive **only** a 15-year prison term.  His actions as an 18-year old will forever haunt him.  Yet anyone who meets him would surely see that he is a gentle soul who, due to the loneliness of his existence, unchecked mental health issues, and unaddressed unhealthy sexual urges, acted like a "monster".  Those are his words.  After cooperating with the agents and revealing all of his criminal conduct, he painfully revealed, "I feel like I am a monster".  With this filing I will strive to have this Court come to know and understand my client, and how he has matured and grown more during his two years of incarceration than in all of his previous teenage years.  That task is especially difficult given the nature of the charges, the vast prison exposure, and because the conduct occurred at such a young age.  We ask the Court to maintain the perspective that this case is tragic, not just as a result of the harm to my client's young cousin and to the victims whose images existed on Richard's computer and in the child pornography cyber world, but also due to the circumstances of Richard's young life and the severe punishment that this Court is compelled to consider.

1

**DEFENDANT'S BACKGROUND**

Richard was raised in Mayfield, NY, with three brothers – Robert, charged with similar offenses, half-brother Jordan, 18, and Joe, 26, wheelchair bound with spina bifida (PSR 70[1]).  His parents separated when he was 14 years old.   He reported to probation and Dr. Bashkoff that his father would discipline him with spankings (PSR 71; Bashkoff I, p. 2). Richard relates in his letter to this Court that his father was both distant and explosive.  He resented school officials for blaming his mother for his difficulties at school and trying to have him move in with his father.  Richard reports that the break up with his mother was so bad that his father told him he had to choose between his parents.  After a few jail visits soon after his arrest, Richard's father has had no contact with him for over 18 months (see, Defendant's letter – hard copy provided).

Richard suffered extensive, relentless bullying that began in elementary school, at a distressingly young age, and continued until he left school in the 10th grade.  He reported that he was verbally taunted and physically struck because, as a very, very large young child, he was an easy target, although he never fought back (PSR 73).  His mother's efforts to resolve the bullying were unsuccessful and Richard became a recluse, suffering from anxiety and depression that went untreated and un-medicated (Bashkoff I).  He reported considering suicide frequently for 2 to 3 years before his arrest (PSR 73-75).

---

[1] "PSR" refers to the US Probation PSIR; "Bashkoff I" to Dr. Bashkoff's 8/26/13 report; "Bashkoff II" to the 5/12/15 Bashkoff report; "MSF" refers to Mayfield Central School records that were also obtained by US Probation.

2

Rensselaer County Jail records note his regimen of medication for anxiety and depression, and the fact that he has lost 60 pounds since his arrest (PSR 77).

Richard's school records fully support Richard's reporting. Mayfield School District records reveal that he was bullied as early as the first grade, and it appears to have been cruelly unrelenting for ten years, from 2001 through 2011:

> 11/01, Grade 1 - Mother reported that someone called him "fatty" on the bus (MHS Parent Teacher Conference Summary);
>
> Grade 6 (undated)- "[illegible] people picking on him" (MHS Parent Teacher Conference Summary);
>
> 10/27/08 note - "mom says kids pick on him b/c of his size.  He is sensitive to teasing";
>
> Undated note  - "Matt Messina teasing – spitting food on him …Jimmy Beach poking him";
>
> 2/18/11 note  - "told [school counselor] Bryan kids were hitting him/picking on him";
>
> 2/18/11 note  - "[mother] Mary Berg says a project was destroyed about a year ago";[2]
>
> 2/18/11 note  -  four named kids "hitting him";
>
> 2/28/11 note  -  parents phone out of service – no response from cell phones;
>
> 3/31/11 note  - "headaches, got medications; MRI apt … tells mom he's not going to school";
>
> 5/4/11 note    -  mom "says that [the school] is doing nothing about the harassment he endures at school … says Richard 'has told all of us [at school] but we've dong nothing'";

---

[2] Richard related to this writer that a project he made at school was destroyed and that boys who regularly taunted him were throwing around its remnants and laughing at him.

3

5/4/11 note    - "brought up living with dad as option because Jordan lives with dad and his attendance has improved since move with dad.  He clearly was upset by this suggestion and when I asked him what he was thinking he stated 'my mind is blank'".

After her first interview, Dr. Bashkoff noted that Richard "appears to have suffered from chronic and severe depression for many years…He has engaged in years of self-hatred and self-loathing" (Bashkoff I, p. 3).  She noted her opinion that defendant, who had no intimate relationships in his life, does not pose a danger to society.  "He is introverted, shy and socially awkward.  He has a number of intimacy deficits" (Bashkoff I, p. 5).  The positive changes that have been apparent to this writer since Richard's arrest were also obvious to Dr. Bashkoff during her follow-up interview.  She notes that he "described a sense of relief and freedom, as a result of disclosing his unlawful behaviors.  He appears to be more at peace with himself than when I first saw him almost two years ago" (Bashkoff II, p. 1).  Richard was also more revealing about his upbringing.  His ability to discuss these matters is consistent with his improved mental state as a result of having addressed his anxiety and depression, and feeling some relief from disclosing his offenses:

> Although Mr. Hastings reflected on his childhood as normal, it was anything but normal.  He grew up in a household with three brothers.  The oldest was a special needs child … His mother was markedly unassertive and introverted.  His father was intermittently explosive.  Mr. Hastings recalls being a target of chronic physical and emotional abuse by his father.  He shared a number of repetitive beatings and at one time his father took his and his brother's head and knocked them together. He recalls feeling very sick after that incident for several days.  School was not a safe haven for him or a remedy to the suffering and abuse in his home environment.  Mr. Hastings was socially awkward, introverted and almost **6 foot 4 inches and 350 pounds by the age of 12**.  The ridicule started in the first grade.  Initially the abuse was verbal and then became physical He would cry for days and would be fearful of bodily harm everyday he entered school ... (emphasis added).

4

As a result he would run off into his classroom for safety reasons. Mr. Hastings' parents were not good advocates for his protection. The school was aware of the alienation and bullying, but could not enforce any protective measures. Consequently, he quit school in the 9th grade. He no longer could take the emotional and physical abuse. After dropping out of a year, he decided to try again and began the 10th grade. The bullying and ridicule continued and he eventually dropped out again in 2013 … He has led a very socially repressed life. He has marked social deficits.

### RISK ASSESSMENT & PSYCHOLOGICAL EVALUATION

Dr. Bashkoff found, after her first interview, that he is a "moderate risk to re-offend **if he does not seek sex offender treatment**" (Bashkoff I, p. 4) (emphasis added). Further, this assessment was premised on him being subject to a only "brief period of incarceration", as Dr. Bashkoff was unaware of the massive prison exposure (Bashkoff I, p. 5). She emphasized as positive factors his admission of full culpability, empathy for his victim, his eagerness to address his underlying issues, as well as his own extreme psychological impairment (Bashkoff I, p. 4-5). Dr. Bashkoff indicated that Richard is classified in the literature as an "opportunistic pedophile", not a "predator pedophile" (Bashkoff I, p.4).

The follow-up evaluation demonstrated a positive progression with regard to her prognosis as he was managing his depression, this improvement made him a "suitable candidate for both psychotherapy and sexual offender treatment", and she viewed him as "an individual who will be able afer a period of incarceration, to become a law abiding citizen" (Bashkoff II).

Within the grey area of forecasting the future conduct of individuals who have engaged in pedophilic conduct, the qualities demonstrated by Richard – empathy for victims, remorse,

5

willingness to engage in counseling, and an acknowledgement of his unhealthy urges at a very young age – are positive, hallmark characteristics of an individual who can manage, if not overcome, the issue.  I would urge the Court to engage Richard at sentencing to gain a sense of those qualities, or to order a second risk assessment to obtain the opinion of a second expert in addition to Dr. Bashkoff, so that the Court can gain confidence in the likelihood that Richard will overcome the affliction that led him to this conduct.

## ACCEPTANCE OF RESPONSIBILTY

Upon arrest, Richard was extremely cooperative with the agents, not just admitting his crimes, but providing the details regarding that conduct, including his computer and internet use, that helped complete their investigation.  Further, he was immediate in his expressions of regret, acceptance of responsibility, and even self-loathing over his self-admitted deplorable conduct.

Richard's letter to the Court continues those genuine expressions of remorse and internalized pain over his actions.  He describes the bullying at school as relentless, characterizing it as lasting "for hours a day while I was in school, and days when he would run off the bus, dart to his room, "then just cry and somedays I just wish I'd die and let all of my pain leave my body".  He also describes feeling left-out within his family and fearful of his father.

His relationship with his victim/cousin is complicated and, ultimately, tragic.  Given his own isolation it is both sad, and not terribly surprising, that he would bond with his younger relative and feel like her protector.  Richard accepts and recognizes the pain he has caused: "Unfortunately, I couldn't

6

protect her from the one person that was hurting her the most, myself … Nothing I did was by force … but that doesn't change the fact that it happened and it will impact her for life … I know that she must see and feel the same things [repeating in her head], and that pains me to know that I am the one responsible for that and how no matter what I do now that they can never be physically or mentally undone". Richard also expresses his remorse and understanding of the consequences of his actions in downloading images as well: "… just because I don't know them doesn't mean that I didn't physically hurt them, because I mentally and emotionally hurt them. I am one more person who … added to the pain and humiliation that those girls must have went through".

In assessing Richard's expressions of remorse, and in attempting to predict whether he will have moved beyond his unhealthy obsessions upon his release as an adult, it is telling that these are the words not just of a 20 year-old, but one who has had a stilted maturation process. Yet his words make clear that he has made great strides towards understanding himself, so that his desire to manage the guilt associated with his conduct, along with appropriate treatment, should result in a low risk of reoffending.

## MOTION FOR A NON-GUIDELINE SENTENCE

This Court is familiar with the history of child pornography guidelines, and how that history is particularly relevant to the notion that federal judges may no longer "presume the Guidelines range is reasonable" or that they reflect the latest knowledge in the field. *Gall v. U.S.,* 128 S.Ct. 586, 596-97; *Rita v. U.S.,* 127 S.Ct. 2456, 2465 (2007). From 1987 to 2007 the mean sentence for defendants

convicted of pornography/prostitution offenses rose over 300%.  2007, Sourcebook, www.ussc.gov /ANNRPT/ 2007/ SBTOC07. htm   It has been well documented that the history of 2G2.2 reveals that those Guidelines are not based upon the Sentencing Commission's expertise and should not be afforded deference.  The judicial disdain for 2G2.2 was articulated in U.S. v. Dorvee, 604 F.3d 84 (2nd Cir. 2010) referring to them as an "irrational [and] eccentric Guideline of highly unusual provenance … formulated by the Commission, and amended several times, without empirical data".  The Second Circuit directed District Courts to "take seriously the broad discretion they possess in fashioning sentences under 2G2.2 – ones that can range from non-custodial sentences to the statutory maximum – [which] unless carefully applied, can easily generate unreasonable results" (Id. at 96-98).

     The statistics for §2G2.2 are indicative and instructive when assessing the sentencing provisions directed at child pornography "production" Guidelines contained in 2G2.1.  A simple review of §2G2.1 reveals that it reflects similar over-reaching and excessive punishment recommendations.  In its zeal to exponentially increase those child pornography guidelines, Congress failed to provide any exceptions or reductions within §2G2.1 for an offender who is not in the business of producing offensive materials.  A review of §2G2.1 demonstrates that the production Guidelines bear no rational relationship to assessing appropriate punishment for someone like Richard, especially at a time in technological history when "production" does not require special equipment, but rather is simple and available to anyone with a computer or smart phone.  As such, given the simply outrageous recommendations, the Guidelines contained in §2G2.1 should, therefore, be ignored.

8

The Base Level Offense, 32, calls for a 10-year sentence before adjustments.  But there are no reductions provided, only increases, signifying that Congress had nothing in mind other than profiteering mass producers.  Analyzing the Guidelines is ultimately irrelevant and futile as the suggested sentences are so stratospheric that only a non-Guideline sentence can provide some semblance of sanity.  Indulging the particular applications only diverts from the only rational conclusion that they should <u>not</u> be taken into account. See, *U.S. v. Booker*, 125 S.Ct. 738 (2005).  Similarly, the 15-year statutory minimum could not have been intended for a troubled 18 year old like Richard Hastings, and should not be viewed as a guidepost for an appropriate sentence.  Rather the Court should, in relying exclusively on the factors in 18 USC §3553(a), determine that the 15-year minimum would be the most just outcome.

1. **18 USC §3553(a)(1)** - **nature and circumstances of the offense and the history and characteristics of the defendant**:

The nature of all of the offenses, including that involving physical touching that was prosecuted in state court, are more than adequately addressed by the 15-year minimum associated the production guilty plea.  Under the circumstances of this case, it is appropriate that the "nature of the offense" is coupled within the same subsection as the "circumstances of the offense and history and characteristics of the defendant", as these considerations are all interconnected.

The circumstance of the offense related to the cousin-victim is that she resided in Richard's home.  Richard, as an awkward and sheltered 18 year old could not have sought out any victim who

9

was outside of his home, or who was not within reach of his computer.  While this circumstance does not diminish the gravity of the offense, it should certainly play a role in the Court's assessment of the risk Richard poses on release, and how long the incarceration needs to be in order to achieve the goals associated with the perceived risk.

The history and characteristics of the defendant are, as spelled out above, simply unfortunate. Beyond the fact that his tortured teenage existence led to his committing acts that only brought pain and emotional torment to him, and his victims, it seems clear that he otherwise was, and will almost certainly always be, a law-abiding citizen.

1. **18 USC §3553 (a)(2)(A), (B) & (C) -  the need for the sentence imposed — (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant.**

Once again, all of these §3553 considerations are more than adequately addressed by the 15-year minimum associated the production guilty plea. 15 years in prison certainly demonstrates that the crimes of possession and production are serious, promotes respect for the law, and, under any view, both affords deterrence and provides "just" punishment, if not more so than necessary.  As a point of comparison and perspective, defendant's sentence in state court, for having admitted actual physical sexual abuse, was 3 years.[3]  This highlights the draconian nature of these child

---

[3] That sentence was even agreed to run concurrent in light of the minimum on this matter. The prosecution has agreed to re-sentence him after this sentencing.

10

pornography statute and guidelines, and is consistent with the current legislative movements regarding mandatory minimums and over-incarceration. [4]

The more difficult questions, as always, is if the public needs to be protected from Richard, and how much prison is necessary and appropriate to do so. Richard is neither evil, nor beyond redemption. He is largely a product of the circumstances that confronted him in his youth. There is nothing to suggest that he is an incurable pedophile. To the contrary, he demonstrates the qualities that support the most likely assessment that he is on a speedy path to self-awareness and avoiding repeat conduct: remorse, empathy for his victims, and an articulated desire to understand himself, undergo treatment and get past his self-professed addiction. Having unburdened himself of his painful secrets he has made great strides in that process as he can openly discuss these issues, and experience the benefits of not keeping secrets and committing acts that tormented and pained him.

To the extent that prison time is a necessary part of this process to protect the community, in addition to the protections that will be afforded by supervised release under the strict scrutiny of US Probation, and sexual offender status, a 15-year term is beyond any time necessary to achieve these statutory goals. Neither the actual physical abuse of his cousin, nor the acts of production or possession of child pornography, can justify a sentence in excess of 15 years.

---

[4] See, http://www.heritage.org/research/reports/2014/02/reconsidering-mandatory-minimum-sentences-the-arguments-for-and-against-potential-refors; also, http://www.foxnews.com/politics/2014/01/05/congress-shows-bipartisan-support-changing-mandatory-sentencing-laws/.

11

## **CONCLUSION**

Based upon the foregoing, it is respectfully requested that this Court not simply depart from the Guidelines, but disregard them altogether, and sentence Richard Hastings to the minimum of 15 years, a horribly long sentence for crimes committed at 18 years old, that is more than sufficient under 18 USC §3553.[5]  This sentence will insure that Richard, who has already made great strides in understanding himself and what brought him to commit these offenses, is given more than sufficient punishment as well as time to fully address those issues so that he will not present any risk upon his release.  Further, in light of this lengthy minimum sentence, we ask that his sentence be ordered to run concurrent with the 3 year sentence imposed in Fulton County Court for the offenses related to sexual abuse of his cousin.  Finally, we ask that the court recommend commitment to FCI Devans, Mass., which is only one of two federal prisons that has both a Residential Sex Offender Treatment Program and a Sexual Offender management Program.

FCI Devans is not only close to defendant's family, but it is also uniquely suited to this defendant's needs. [6]

Dated: June 16, 2015                                Respectfully Submitted,


                                                    LEE GREENSTEIN, ESQ.
                                                    Federal Bar Roll 101859

---

[5] The Court is urged to neither fine the defendant nor order restitution.  The fact that such huge fines are contained in the statute, once again shows the disconnect between those intended to be targeted, mass producers of child pornography, and this defendant.

[6] http://www.bop.gov/jobs/docs/cpdipdev2.pdf - ("Because of unique programming offered at FMC Devans, sex offenders make up approximately 40% of our inmate population. Inmates with a history of sexual offending at this institution are automatically enrolled in the Sex Offender Management Program (SOMP), a mandatory program assignment for sex offenders who do not volunteer, or are otherwise ineligible, for the residential treatment program here. The SOMP is designed to evaluate risk of sexual re-offense and associated management needs, and to provide and/or recommend appropriate management services during incarceration and upon release to the community. Our other sex offender-specific program is the residential Sex Offender Treatment Program (SOTP-R). The SOTP-R is a voluntary, intensive, residential therapeutic program for higher risk male sex offenders serving time in the Bureau of Prisons. This program, the only SOTP-R (where all enrolled inmates live on the same unit) in the BOP, employs a wide range of cognitive-behavioral and relapse prevention techniques to treat and manage sexual offenders").